IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 18, 2018

FILED
10/08/2018
Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. RUBIN P. PENA

**Appeal from the Circuit Court for Rutherford County
No. F-74450      Royce Taylor, Judge**

## No. M2017-01663-CCA-R3-CD

The Defendant, Rubin P. Pena, was convicted by a Rutherford County Circuit Court jury of vehicular homicide by reckless conduct, a Class C felony, three counts of reckless aggravated assault, a Class D felony, and leaving the scene of an accident resulting in a death, a Class E felony. *See* T.C.A. §§ 39-13-213 (2014) (amended 2015) (vehicular homicide by reckless conduct), 39-13-102 (reckless aggravated assault) (2014) (amended 2015), 55-10-101 (leaving the scene of an accident resulting in a death) (2014). The Defendant was sentenced as a Range I, standard offender and received a six-year sentence for vehicular homicide by reckless conduct and concurrent four-year sentences for each reckless aggravated assault conviction. The Defendant also received a two-year consecutive sentence for leaving the scene of an accident resulting in a death, for an effective sentence of eight years' incarceration. On appeal, the Defendant contends that (1) the evidence is insufficient to support his vehicular homicide by reckless conduct and reckless aggravated assault convictions and (2) the trial court erred during sentencing by applying certain enhancement factors. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., AND JOHN EVERETT WILLIAMS, P.J., joined.

Kris M. Oliver, Murfreesboro, Tennessee, for the appellant, Rubin P. Pena.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Andrew Hazley, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

This case arises from a July 20, 2013 car crash, in which Cynthia Joyner was killed and three others were injured. At the August 8, 2016 jury trial, Shanna Phillips testified that she drove Ms. Joyner in Ms. Phillips's Ford Fiesta from Chattanooga to Nashville to see a concert on July 19, 2013. Ms. Phillips stated that she met Ms. Joyner and Jack Gaillard at about 6:00 p.m. at a Chattanooga restaurant. Ms. Phillips stated that she drove Ms. Joyner and Mr. Gaillard to Nashville, that they arrived in Nashville at about 7:30 p.m., and that they "walked around downtown for a while" before going to the concert venue. Ms. Phillips stated that she had two drinks and that she and Ms. Joyner each had two shots of vodka. Ms. Phillips said that she was prescribed diazepam for a medical condition and that she took one-half of a five-milligram diazepam on July 19.

Ms. Phillips testified that Joey Harvey, Ms. Joyner's friend, "worked sound" for a band at the concert. Ms. Phillips stated that the concert ended about 1:00 or 1:30 a.m. and that she agreed to drive Mr. Harvey to Chattanooga. Ms. Phillips testified that she sat in the driver's seat, that Ms. Joyner sat in the front passenger seat, that Mr. Gaillard sat in the backseat behind the driver's seat, and that Mr. Harvey sat in the backseat behind the front passenger seat. Ms. Phillips stated that she began driving on the interstate toward Chattanooga in the high occupancy vehicle (HOV) lane. Ms. Phillips stated that Ms. Joyner and Mr. Harvey were awake, that Mr. Gaillard fell asleep, and that she was driving about seventy-five miles per hour.

Ms. Phillips testified that after driving about twenty minutes toward Chattanooga, she saw headlights coming toward her, that she "pulled [her] car to the left," that she "slammed on the brakes," and that she hit an oncoming vehicle. Ms. Phillips stated that the oncoming vehicle struck the front, passenger side of the Ford Fiesta, that her car "spun around," that the air bags deployed, and that "dust" filled the car. Ms. Phillips said that she got out of the car to check on Ms. Joyner, that Ms. Joyner's head was "laid back," that her breathing was "gurgley," that she had a pulse, and that she was unresponsive.

Ms. Phillips testified that all of the Ford Fiesta's windows were broken and that the car was "smashed up." Ms. Phillips said that she was unable to identify the other car involved in the crash because so many other cars stopped at the crash site. Ms. Phillips stated that she tried to wake Ms. Joyner for about five or ten minutes, that Mr. Harvey was still in the backseat, and that the front, right side of the car received most of the impact. Ms. Phillips said that Mr. Gaillard got out of the car, that he was intoxicated, and that she did not think Mr. Gaillard understood what had happened. Ms. Phillips stated that someone called 9-1-1, that she waited for an ambulance to arrive, and that she never spoke with the driver of the oncoming car.

Ms. Phillips testified that a paramedic reported Ms. Joyner had died and that she could not determine the extent of Mr. Harvey's injuries because he was still inside of the Ford Fiesta. Ms. Phillips said that she and Mr. Gaillard were taken to a nearby hospital, that she suffered a burn on her right hand from the air bag, and that she was in shock. Ms. Phillips stated that she was treated for her injuries, that the hospital collected a sample of her blood, and that police officers questioned her about the crash. Ms. Phillips stated that she saw Mr. Gaillard at the hospital and that he had a concussion, scrapes, and cuts.

LaVergne Police Department Officer Travis Wilson testified that he was transporting a juvenile in the early morning hours of July 20, 2013, that he was driving east on Interstate 24, and that he was driving in the lane to the right of the HOV lane. Officer Wilson said that at about 2:30 a.m., he saw an oncoming vehicle driving west in the eastbound lanes, that the vehicle drove toward him, and that the vehicle was in the HOV lane. Officer Wilson stated that the oncoming vehicle nearly struck his patrol car and that he reported the incident to dispatch.

Officer Wilson testified that that the crash occurred on a "downhill grade" about one-half mile from where he passed the oncoming vehicle. Officer Wilson said that he heard about the crash on his radio, that he went to an entrance ramp near the crash to direct traffic, that he later went to the crash site, and that one of the two vehicles involved in the crash was the same vehicle he had seen driving in the wrong direction.

Joey Harvey testified that he worked as a sound engineer at the time of the crash and that he and Ms. Joyner had been friends for a few years. Mr. Harvey said that he lived in Chattanooga and that he worked as a sound engineer for a band in Nashville. Mr. Harvey stated that he took a "shuttle" from Chattanooga to Nashville on July 19 to work at the concert and that Ms. Phillips agreed to drive him to Chattanooga after the concert.

Mr. Harvey testified that at the time of the crash, he saw a light, that he was "thrown forward," and that he did not recall seeing another vehicle. Mr. Harvey stated that since the crash, he saw a light a few times a day and that certain things triggered his memories of the crash. Mr. Harvey said that when he awoke after the crash, two paramedics were helping Ms. Joyner, who was in the front passenger seat, and that one of the paramedics said, "[W]e are losing her." Mr. Harvey stated that he was very confused, that his left leg was "going the wrong way," and that he broke his leg "just above the knee." Mr. Harvey stated that emergency responders cut the top of the car to remove him because the car was "crushed," that he realized he was injured significantly, and that it felt as though his body "collapsed."

Mr. Harvey testified that he was transported to Vanderbilt University Hospital and that he underwent emergency surgery, during which surgeons placed a "rod," several pins, and screws in his left leg. Mr. Harvey said that he had "day dreams" of the crash

-3-

every five or ten minutes each day and that he did not drive because of the day dreams. Mr. Harvey stated that he was no longer physically able to work as a sound engineer.

Kyle Dunn testified that he was driving eastbound on Interstate 24 on July 20 between 2:00 and 2:15 a.m. Mr. Dunn stated that he saw a black SUV strike a white car, that the SUV began spinning, and that the SUV and the car "hit so hard that [he] could feel the vibration of the impact." Mr. Dunn said that when the SUV stopped spinning, a man got out of the SUV, dropped his hat, ran across the interstate, "hopped" a concrete barrier, and continued running. Mr. Dunn stated that the man was about six feet tall, was of "slim build," and looked like the Defendant. Mr. Dunn said that he stopped his car about fifty yards from the crash and that he did not see any one else get out of the SUV. Mr. Dunn stated that he did not believe "anybody could have survived that wreck" and that he was distraught. Mr. Dunn testified that he approached a car that stopped behind him and that he used the driver's cell phone to call 9-1-1.

On cross-examination, Mr. Dunn testified that he gave the police a written statement and that he initially told the police he thought the black SUV was traveling in the same direction as the Ford Fiesta. Mr. Dunn stated that after the crash, an eighteen-wheeler drove by his car, drove between the SUV and the Ford Fiesta, and struck a concrete barrier. Mr. Dunn said that he told police officers that the driver of the SUV was wearing a burgundy or red-colored shirt and blue jeans.

Tennessee Highway Patrol Trooper Michael Cummins testified that at the time of the crash, he received a call from dispatch describing a vehicle traveling westbound in the eastbound lane and that he began driving westbound to "track" the vehicle. Trooper Cummins stated that he received a second call about a crash in the eastbound lanes and that he drove to the scene. Trooper Cummins said that paramedics were treating a person in the front passenger seat of a Ford Fiesta and that firefighters were extracting a passenger by cutting the top of the car. Trooper Cummins stated that he spoke with Ms. Phillips, that Ms. Phillips said she was the driver of the car, and that she appeared to be in shock. Trooper Cummins said that he believed the crash was a result of a head-on collision and that Ms. Phillips told him the driver of the black SUV was at fault.

Trooper Cummins testified that he approached the black SUV, that the driver's door was open, that a white cell phone lay on the ground, and that he found documents with the Defendant's name inside of the SUV. Trooper Cummins stated that only the driver's door was open and that he did not recall seeing a hat on the ground near the SUV. Trooper Cummins said that the driver's airbag had deployed, that it did not appear a passenger had been in the SUV because the passenger's airbag had not deployed, and that the front, right side of the SUV was damaged.

Trooper Cummins testified that he called his supervisor, the Critical Incident Response Team (CIRT), and the Criminal Investigation Division. Trooper Cummins

-4-

stated that he later went to the hospital where Ms. Phillips and Mr. Gaillard were transported and that a blood sample was collected from Ms. Phillips. Trooper Cummins said that he did not obtain a statement from Mr. Gaillard because he appeared intoxicated and that he did obtain a statement from Ms. Phillips.

On cross-examination, Trooper Cummins testified that on July 20 an arrest warrant was issued for the Defendant for leaving the scene of an accident involving personal injury or death. Trooper Cummins stated that he concluded the Defendant was the driver of the SUV because of the documents inside the SUV, which included employment payroll information, "wire transactions that [the Defendant] sent to Mexico," and a cell phone containing a photograph of the Defendant standing in front of the SUV.

Tennessee Highway Patrol Sergeant Adam Grinder testified that he went to the scene at about 2:30 a.m. Sergeant Grinder stated that he spoke with Trooper Cummins and "called troopers in from throughout the district to help in a search" for the Defendant. Sergeant Grinder said that a Tennessee Highway Patrol helicopter was used in the search, which lasted about four or five hours.

Sergeant Grinder testified that a contact in the white cell phone contained the name "mi vida," which translated to "my life," and that he called the number listed for the contact. Sergeant Grinder stated that a woman answered, that the woman identified herself as the Defendant's wife, and that she said she was looking for the Defendant. Sergeant Grinder stated that the search for the Defendant ended at about noon on July 20, that the Defendant was not found, and that an arrest warrant was issued. Sergeant Grinder said that he and other officers went to the Defendant's home to search for the Defendant and that he was not home.

Sergeant Grinder testified that the Defendant's employer called him the following day, that the Defendant's employer said the Defendant did not come to work, and that the Defendant's employer told him about a conversation he heard between his other employees. Sergeant Grinder stated that the Defendant's employer said he thought the Defendant was going to Mexico and that the Defendant was in Houston, Texas, attempting to cross the border. Sergeant Grinder said that he told the Defendant's employer to contact the United States Marshals Task Force.

Tennessee Highway Patrol Trooper Ricky Lane Alexander, Jr., an expert crash reconstructionist, testified that he was a member of CIRT and that he went to the crash site. Trooper Alexander stated that another officer took photographs of the crash and that he located and marked the evidence on the roadway. Trooper Alexander said that he marked the final resting spot of the black SUV and the Ford Fiesta, tire marks, "gouge marks," scrape marks, fluid trails, and debris and that he completed a CIRT Reconstruction Report. Trooper Alexander stated that after he completed marking the scene, he created a "map of the scene" and took "daytime" photographs.

Trooper Alexander testified that he inspected the black SUV, that the SUV was equipped with airbags, and that only the driver's airbag had deployed. Trooper Alexander stated that the windshield on the right side of the SUV was damaged, that he did not discover blood on the passenger seat, and that he did not find any indication a passenger had occupied the vehicle. Trooper Alexander said that it was not raining at the time of the crash, that he determined the Ford Fiesta was driving east in the eastbound lane, and that the SUV was driving west in the eastbound lane. Trooper Alexander stated that the two cars struck each other head-on and that the "primary direction of force" was on the passenger side of both cars. Trooper Alexander said that Ms. Phillips suffered minor injuries, that he expected the driver of the SUV to have received minor injuries, and that if a passenger had been in the SUV, the passenger would have received serious injuries. Trooper Alexander stated that the SUV had traveled on a "downhill grade," that the passenger seatbelt material did not indicate a passenger had been in the SUV, and that if a passenger had been in the SUV without wearing a seatbelt, the passenger would have been ejected.

Trooper Alexander testified that he obtained a search warrant to remove the crash data recorder system in the black SUV and that his supervisor analyzed the data. Trooper Alexander stated that the SUV was almost twice the size of the Ford Fiesta and that the driver's seatbelt in the SUV was damaged, indicating the driver had worn a seatbelt.

On cross-examination, Trooper Alexander testified that the SUV and the Ford Fiesta stopped about 180 feet apart after the crash and that he did not have the opportunity to view "scrapes and gouges on the roadway" before the crash. Trooper Alexander stated that he inspected the SUV at an impound lot and that he marked "yes" on the report relative to the question of whether the electrical system was damaged because firefighters cut the electrical wires to prevent a fire.

Tennessee Highway Patrol Sergeant Allan Brenneis, an expert crash reconstructionist, testified that he was a CIRT member, that he analyzed the crash data recorder systems from the SUV and the Ford Fiesta, that the data reflected the crash was a head-on collision, and that he filed an analysis report for each vehicle. Sergeant Brenneis stated that the data for the Ford Fiesta reflected that the engine was operating properly and that the airbags deployed. Sergeant Brenneis said that the Ford Fiesta had a total change in velocity of almost thirty-one miles per hour as a result of the crash and that a change of velocity of twenty-five miles per hour or greater was potentially fatal. Sergeant Brenneis stated that the majority of the impact to the Ford Fiesta was to the front passenger side and that the front passenger would have received most of the impact and injuries. Sergeant Brenneis said that the Ford Fiesta was traveling at about seventy-seven miles per hour before the crash and about seventy miles per hour when the airbags deployed and that the car was not accelerating at the time of the crash. Sergeant Brenneis stated that after the Ford Fiesta was hit, it rotated clockwise, that the rear of the car struck a concrete barrier, and that both the driver and front passenger seatbelts were fastened.

Sergeant Brenneis testified that the data recorder for the SUV reflected that the driver's seatbelt was fastened, that the SUV was traveling forty-three miles per hour five seconds before the crash, and that it was traveling forty-five miles per hour one second before the crash. Sergeant Brenneis said that the Defendant "drove directly into the crash without ever touching the brakes." Sergeant Brenneis stated that the passenger airbag was functioning properly and that it did not deploy.

Dr. Erin Carney, an expert in anatomical, clinical, and forensic pathology, testified that she worked at the Center for Forensic Medicine and that she performed Ms. Joyner's autopsy. Dr. Carney stated that Ms. Joyner died on July 20 at 2:51 a.m. and that Ms. Joyner had multiple injuries. Dr. Carney stated that Ms. Joyner suffered most of her injuries to the head and that she suffered a subdural hemorrhage, or bleeding of the brain. Dr. Carney said Ms. Joyner suffered a "tear" on her brain stem and on the "deep nuclei" of the brain. Dr. Carney said that the cause of death was multiple blunt force injuries and that her manner of death was an "accident."

Gloria Aguilera testified that she worked at the Nashville 3-1-1 information call center and that she received a telephone call from the Defendant on November 14, 2013. Ms. Aguilera stated that the Defendant spoke in Spanish. Ms. Aguilera said that she called the police to report the telephone call after speaking with the Defendant. An English translation transcript and a recording of the telephone call were received, without objection, as exhibits.

The transcript reflected that the Defendant told Ms. Aguilera that he was involved in a car crash about three months previously, that he "fled the scene," that "someone died," and that he wanted to "turn [him]self in." The Defendant said that the crash occurred on Interstate 24 in Nashville and that he was calling from Mexico. When Ms. Aguilera asked, "You hit someone and you just left, is that what happened," the Defendant responded, "No, I didn't hit him, he crashed against my car and died, and I [ran] away." The Defendant stated that "in [his] heart, [he] can't deal with this situation" and that he could not "run all the time." The Defendant said that his family lived in Nashville, that he had not spoken with his family, and that his family was scared. The Defendant stated that he drove a 2003 black Chevrolet Tahoe, that he was not intoxicated at the time of the crash, that he had fallen asleep, and that it would take him about two days to travel to the Mexico-United States border.

United States Marshals Criminal Investigator Adrian Romaniuk testified that he began investigating the case on July 22, 2013. Investigator Romaniuk stated that he interviewed the Defendant's wife, Janet Sanchez, the Defendant's employer, and the Defendant's co-worker, that he obtained a search warrant for the Defendant's cell phone, and that he concluded the Defendant fled to Mexico. Investigator Romaniuk said that a few months later, the Defendant called Nashville "Public Works" and that Investigator Romaniuk learned the Defendant was trying to contact him.

Investigator Romaniuk testified that the Defendant called him by telephone on December 13, 2013, that the Defendant said he was living in a barn in Mexico, and that the Defendant said he would call Investigator Romaniuk again later. Investigator Romaniuk stated that the Defendant called him later the same day, that the Defendant was very emotional, that the Defendant wanted to know the name of the woman who died, and that the Defendant said he missed his wife and children. Investigator Romaniuk said the Defendant said that he suffered from nightmares related to the crash, that he was suicidal, and that he was having difficulty sleeping. Investigator Romaniuk stated that the Defendant said he did not want to go to jail, that he told the Defendant he would go to jail, and that the Defendant offered to give him "his oldest son[,] a gold chain[,] and a pendant." Investigator Romaniuk stated that the Defendant said he would consider surrendering and that the telephone call ended.

Investigator Romaniuk testified that the Defendant called him again the following Monday, that the Defendant said he would surrender, and that the Defendant wanted to speak with Ms. Sanchez. Investigator Romaniuk stated that he called Ms. Sanchez, that Ms. Sanchez said she would speak with the Defendant about surrendering, and that he, Ms. Sanchez, and the Defendant participated in a group telephone call. Investigator Romaniuk stated that following the telephone call, the Defendant surrendered at the border between Mexico and Texas. On cross-examination, Investigator Romaniuk testified that he and the Defendant never spoke about whether the Defendant had driven the black SUV at the time of the crash.

Janet Sanchez testified that she was the Defendant's girlfriend at the time of the incident and that they had since ended their romantic relationship. Ms. Sanchez stated she and the Defendant were from Mexico, that they had known each other since childhood, that they were together twenty-two years, and that they had five children together. Ms. Sanchez said that in July 2013, she drove a gold Chevrolet Tahoe SUV, that the Defendant drove a black Chevrolet Tahoe SUV, and that the Defendant did not allow anyone to drive his SUV. Ms. Sanchez stated that she worked until 3:00 or 4:00 p.m. on July 19 and that she met the Defendant at a family friend's home after work. Ms. Sanchez said that she saw the Defendant drinking beer outside of the home with a man she did not know and that the Defendant appeared "a little" intoxicated. Ms. Sanchez stated that she went inside for about ten or fifteen minutes, that the Defendant was holding a beer when she walked outside, and that about three empty beer bottles were on the ground. Ms. Sanchez said that she told the Defendant that they needed to go home to feed their children, that the Defendant asked to "go some place . . . and that means to drink or like a bar," and that the Defendant said he would follow her home in his SUV.

Ms. Sanchez testified that the Defendant was alone, that she believed the Defendant was following her, and that she realized the Defendant was no longer driving behind her. Ms. Sanchez said that she called the Defendant six or seven times, that she spoke with him by telephone more than once, and that the Defendant told her "don't

worry." Ms. Sanchez stated that the Defendant sounded intoxicated when she spoke with him, that he did not come home, and that the trial was the first time she had seen the Defendant since that night.

Ms. Sanchez testified that she used a "tracking" application on her cell phone to determine the Defendant's cell phone location, that the Defendant's cell phone indicated he was at a bar, and that she went to bed. Ms. Sanchez stated that she awoke at about 5:00 or 5:15 a.m. on the morning of July 20, that she used the "tracking" application, and that the Defendant's cell phone signal indicated he was near a gas station located on Interstate 24. Ms. Sanchez stated that she left her home to look for the Defendant at about 6:00 a.m., that she searched for him at multiple hotels, and that she did not find the Defendant. Ms. Sanchez said that when she returned home, her children told her a police officer came to speak with her about the Defendant and that the police were looking for the Defendant. Ms. Sanchez stated that she saw on television that the Defendant had been involved in a crash, that she called the Defendant's cell phone, and that a police officer answered. Ms. Sanchez said that she went to the crash scene to see if the police had found the Defendant and that she was worried for the Defendant's well-being.

Ms. Sanchez testified that she stayed at the scene for several hours while the police searched for the Defendant, that the police never found him, and that she went home. Ms. Sanchez stated that the police came to her home later that night and that she told the police she had not spoken with the Defendant. Ms. Sanchez said that the police came to her home again the next morning to search for the Defendant, that she did not know his whereabouts, and that he was not in her home. Ms. Sanchez stated that the police later came to her place of employment and that she told the police she had not spoken with the Defendant. Ms. Sanchez said that she was contacted by a United States Marshal in November 2013 and that she spoke with the Defendant by telephone.

Ms. Sanchez was shown two photographs of the black SUV after the crash and Ms. Sanchez testified that speakers, a hat, sunglasses, Marlboro cigarettes, and a "work badge" reflected in the photographs belonged to the Defendant. Ms. Sanchez was shown a set of keys and stated that they were the Defendant's SUV keys.

On cross-examination, Ms. Sanchez testified that she worked until about 4:00 p.m. on July 19, that she went to a family friend's home after work, and that the Defendant had worn yellow shirt. Ms. Sanchez stated that the Defendant's breath smelled of alcohol, that she saw the Defendant drinking a beer, and that the Defendant "was not drunk in the sense that I understand being drunk . . . but he was in a sense not completely there."

Upon this evidence, the Defendant was convicted of vehicular homicide by reckless conduct, three counts of reckless aggravated assault, and leaving the scene of an

accident resulting in a death. The Defendant was found not guilty of vehicular homicide by intoxication. This appeal followed.

## I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his vehicular homicide by reckless conduct and reckless aggravated assault convictions. He argues that the evidence is insufficient to prove that he was aware of any substantial and justifiable risk or that he consciously disregarded such risk. The Defendant asserts his accelerating at the time of crash proves he was unaware of a risk. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-381.

Vehicular homicide is defined, in relevant part as, "the reckless killing of another by the operation of an automobile . . . as the proximate result of . . . [c]onduct creating a substantial risk of death or serious bodily injury to a person[.] T.C.A. § 39-13-213(a)(1). A person commits reckless assault when a person "recklessly causes bodily injury to another[.]" *Id*. § 39-13-101(a)(1) (Supp. 2012) (amended 2013). "'Bodily injury' includes a cut, abrasion, bruise, burn, or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id*. § 39-11-106(a)(2) (2014).

A person commits aggravated assault by reckless conduct when the reckless assault "involved the use or display of a deadly weapon." *Id*. § 39-13-102(a)(1)(B). A "deadly weapon" is defined as "a firearm or anything manifestly designed, made or

adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id*. § 39-11-106(a)(5)(A), (B). This court has held that a vehicle may be used as a deadly weapon. *See State v. Tate*, 912 S.W.2d 785 (Tenn. Crim. App. 1995).

Both vehicular assault by reckless conduct and reckless aggravated assault require that the Defendant acted "recklessly" beyond a reasonable doubt.

> 'Reckless' means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

T.C.A. § 39-11-106(a)(31).

In the light most favorable to the State, we conclude the evidence is sufficient to support the Defendant's convictions for vehicular homicide and reckless aggravated assault. Officer Wilson testified that he saw an oncoming vehicle driving west in the eastbound lanes on Interstate 24 in the early morning hours on July 20, 2013. Officer Wilson stated that he saw the vehicle about one-half mile from where the crash occurred and that the vehicle almost struck his patrol car. Officer Wilson said that he responded to the crash at a later time and that the vehicle he saw earlier was involved. Mr. Dunn testified that he was in the eastbound lane, that he saw a black SUV hit the Ford Fiesta, and that the SUV drove in the wrong direction.

Trooper Alexander, an crash reconstructionist, testified that the black SUV was driving east in the westbound lane when it struck the Ford Fiesta, that the two cars struck each other head-on, and that the passenger side of each car received most of the impact. Trooper Alexander stated that the SUV had traveled on a "downhill grade." Sergeant Brenneis, also a crash reconstructionist, testified that the SUV's crash data recording system reflected that the SUV was traveling at forty-three miles per hour five seconds before the crash and forty-five miles per hour one second before impact. We conclude that the evidence is sufficient to support the jury's findings that the Defendant acted recklessly by disregarding a substantial and unjustifiable risk and that the Defendant was aware of such risk. *See id*. § 39-11-106(A)(31). We note that the Defendant does not dispute that the crash resulted in a death and the injuries to three other victims. The Defendant also does not raise the issue of identity on appeal and does not challenge whether he was the driver of the SUV. The Defendant is not entitled to relief on this basis.

## II. Sentencing

The Defendant contends that he received an excessive sentence because the trial court erred in applying two enhancement factors. He argues that the court erred by applying enhancement factor (10) because no proof showed whether the Defendant hesitated prior to the occurrence of the offenses and that the record is unclear whether this factor was applied to the Defendant for causing harm to the victims or to others on the roadway. *See id.* § 40-35-114(10) (2014) ("The defendant had no hesitation about committing a crime when the risk to human life was high[.]"). He argues that the court erred by applying enhancement factor (9) because using a deadly weapon is an essential element of vehicular homicide and of leaving the scene of an accident resulting in a death. *See id.* § 40-35-114(9) ("The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense[.]"). The State argues that the court properly applied enhancement factor (10) because the Defendant's conduct created a high risk to other drivers. The State concedes that the court erred by applying enhancement factor (9) but that the misapplication of an enhancement factor does not entitle the Defendant to relief because he received a within-range sentence.

At the sentencing hearing, Mr. Harvey testified that as a result of the crash, he suffered a broken femur and a broken pelvis. Mr. Harvey stated that he underwent emergency surgery for his broken femur, that he had four subsequent surgeries, and that the surgeries were painful. Mr. Harvey said that he suffered from "psychological difficulties and . . . cognitive problems" and that he received physical rehabilitation for his injuries. Mr. Harvey stated that the surgeries, physical therapy, and medical treatments were expensive, that he lost "a good amount of money over this."

Mr. Harvey testified that he did not have health insurance at the time of the crash, that he was not capable physically of working as a sound engineer, and that he was looking for employment. Mr. Harvey stated that he still owed about $300,000 for medical treatment, that he was having knee replacement surgery within one year, and that the surgery would cost about $30,000 to $50,000. Mr. Harvey stated that "they had to cut me out of the car" and that the crash was "very traumatic."

The Defendant made an allocution to the trial court and stated that "people" were hurt in the crash and that "I feel for [Ms. Joyner] also." The Defendant said that the crash changed his life and that he wanted the victims to "know the truth." The Defendant stated that a man named "Fabian" was driving the black Chevrolet Tahoe SUV, that he and another man were passengers, and that he sat in the front passenger seat. The Defendant said that after the SUV struck the Ford Fiesta, the SUV spun multiple times before stopping beside a concrete barrier.

The Defendant stated that he asked Fabian "who he hit" and that the Defendant began to record a video on his cell phone. The Defendant stated that the backseat passenger left the SUV, that Fabian could not get out because the driver's door was against the barrier, that the SUV was still "running," and that "it went forward to where the car was." The Defendant said that the SUV stopped, that Fabian placed the SUV in park, and that he and Fabian got out of the SUV. The Defendant stated that he realized he wore only one shoe, that he went back to the SUV to retrieve his other shoe, and that Fabian stood near the back of the SUV. The Defendant said that Fabian wore a red shirt, that he wore a yellow shirt, and that he saved the video recording on his cell phone. The Defendant stated that he started a second video recording on his cell phone, that he told Fabian not to run, that he felt nervous, that it was an accident, and that he did not know what happened. The Defendant said that he saved the second recording and placed his cell phone in the front passenger seat of the SUV.

The Defendant stated that he walked to the Ford Fiesta after he heard a woman scream, that he saw Fabian run, and that he tried to "calm [the woman] down." The Defendant said that "something came in front of me . . . it hit my truck," that he saw the black SUV "in the air," and that he ran. The Defendant stated that he believed Ms. Joyner died "at that impact," that the damage to the SUV was caused by the "big truck," and that the truck dragged the SUV more than eighty feet. The Defendant said that the truck drove in the wrong direction on the interstate and that he wanted the "government" to "find out the truth." The Defendant stated he was innocent.

The trial court considered the victim impact statements submitted during the sentencing hearing and determined that Mr. Joyner's impact statement was the most compelling because it stated that he and Ms. Joyner's son, who suffered from autism, had "breakdown after breakdown."[1] The court noted that it had to consider the purposes and principles of sentencing, found that the Defendant committed a Class C felony, three Class D felonies, and one Class E felony, and determined that the Defendant was eligible for alternative sentencing. The court considered the Defendant's criminal history, stated that "the ones that I looked at were misdemeanors," and noted that the offenses involved multiple victims.[2] The court found that no mitigating factors applied in this case and stated that although the Defendant "turned himself in, that is not considered a separate mitigating factor."

The trial court found that probation was not appropriate in this case. The court determined that the Defendant's offenses were serious and that the offenses involved serious injuries and a death. The court determined that confinement was suited to provide an effective deterrent and that probation would depreciate the seriousness of the offenses. The court found that the Defendant could not comply with the terms of

---

[1] The victim impact statements were not included in the record.
[2] The presentence report was not included in the record.

-13-

probation because he had previously shown a disregard for the law. The court noted that the Defendant was deported from the country twice, that he illegally entered the country, and that such actions reflected on the Defendant's "character." The court found that the Defendant had a criminal history and that the seriousness of the offenses precluded the court from sentencing the Defendant to probation.

The trial court noted that the Defendant's behavior indicated "little or no regard for human life" and that the Defendant did not hesitate in committing a crime in which the risk for human life is high. The court found that until the offenses, the Defendant led a productive life, that he provided for his family, and that he had steady employment. The court determined that this case did not meet the applicable requirements for consecutive sentencing.

The trial court sentenced the Defendant as a Range I, standard offender and imposed concurrent sentences of six years for vehicular homicide by reckless conduct and four years for each reckless aggravated assault conviction. The Defendant received a consecutive two-year sentence for leaving the scene of an accident resulting in a death, for an effective sentence of eight years' incarceration.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The record reflects that the trial court's determination relative to enhancement factor (10) is supported by the record. The court determined that the Defendant's behavior indicated "little or no regard for human life" and that the Defendant did not hesitate in committing a crime in which the risk for human life was high. The record reflects that the Defendant drove west in the eastbound lanes on Interstate 24 and that his conduct placed other drivers on the interstate, such as Officer Wilson, Officer's Wilson's juvenile passenger, and Mr. Dunn, in danger. The court did not abuse its discretion in applying enhancement factor (10).

The State concedes, and we agree, that the trial court erred by applying enhancement factor (9) because the use of a motor vehicle is an essential element of vehicular homicide by reckless conduct. *See* T.C.A. § 40-35-114, Advisory Comm'n Cmts.; *see also State v. Arroyo*, E2002-00639-CCA-R3-CD, 2003 WL 1563209, at *4 (Tenn. Crim. App. Mar. 27, 2003). However, we conclude that such error did not render the Defendant's sentence excessive. Vehicular homicide by reckless conduct is a Class C felony and warrants a sentence of between three and six years for Range I offenders. *See* T.C.A. § 40-35-112(a)(3) (2014). The Defendant was sentenced as a Range I offender to a within-range sentence of six years' incarceration for vehicular homicide by reckless conduct. The record reflects that the court applied other enhancement factors, which the Defendant does not challenge. The court considered the purposes and principles of sentencing, the victims' impact statements, and the Defendant's criminal history. The sentence complies with the purposes and principles of the Sentencing Reform Act. "A sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles" of sentencing. *Bise*, 380 S.W.3d at 709-10. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE